# IN THE COURT OF APPEALS OF IOWA

No. 20-0132
Filed October 20, 2021

**STATE OF IOWA,**
Plaintiff-Appellee,

**vs.**

**STEVEN ANDREW MAUCK,**
Defendant-Appellant.
_____

Appeal from the Iowa District Court for Des Moines County, Mary Ann Brown, Judge.

Steven Mauck appeals his conviction for second-degree sexual abuse. **AFFIRMED.**

Curtis Dial of Law Office of Curtis Dial, Keokuk, for appellant.

Thomas J. Miller, Attorney General, and Kyle Hanson and Genevieve Reinkoester, Assistant Attorneys General, and Josh Hughes, Law Student, for appellee.

Considered by Bower, C.J., and Vaitheswaran and Schumacher, JJ.

**BOWER, Chief Judge.**

Steven Mauck appeals his conviction for second-degree sexual abuse, contending the district court erred in denying his motion to strike a prospective juror for cause and his motion for a new trial based on newly-discovered evidence. In not using a peremptory strike or asking for an additional strike, Mauck waived his challenge to the juror. The district court did not abuse its discretion in denying the motion for new trial. We therefore affirm.

Mauck was charged with second-degree sexual abuse. During jury selection, the parties to this case individually questioned members of the potential jury pool. One of the potential jurors, Juror No. 8, was examined regarding her questionnaire responses as follows:

> [PROSECUTOR]: Based on what you read, did you have discussions with family or friends about anything that you had read?
> PROSPECTIVE JUROR [NO. 8]: No.
> [PROSECUTOR]: Based on what you read either on Facebook or through *The Hawk Eye,* did you or have you formed any opinion as to the guilt of the defendant?
> PROSPECTIVE JUROR [NO. 8]: Yes.
> [PROSECUTOR]: And what is that opinion?
> PROSPECTIVE JUROR [NO. 8]: Guilty.
> [PROSECUTOR]: Is that a firmly held opinion?
> PROSPECTIVE JUROR [NO. 8]: Yes.
> [PROSECUTOR]: I don't have any other questions, but [defense counsel] may.
> [DEFENSE COUNSEL]: No questions.
> THE COURT: Well, if I instruct you at the end of this trial as every jury is instructed that you are to reach your verdict based only on the evidence you hear in the courtroom and set aside anything you've heard about it outside the courtroom, are you capable of following that instruction?
> PROSPECTIVE JUROR [NO. 8]: Yes.
> THE COURT: So when you say that you are firmly set on this opinion that he's guilty, what's that based on?
> PROSPECTIVE JUROR [NO. 8]: Just on what I read. That's all that she asked me.

THE COURT: So if you're told that that's not the information, that would not be your opinion or your verdict; is that correct?

PROSPECTIVE JUROR [NO. 8]: Correct.

THE COURT: Okay. Do either one of you want to ask her another question after I just did that?

THE WITNESS: Sorry.

[PROSECUTOR]: Would you accept the fact if you were so instructed that the defendant is presumed to be innocent?

PROSPECTIVE JUROR [NO. 8]: Yes.

[PROSECUTOR]: Okay. And you would not have the expectation that it is the defendant's responsibility to prove his innocence?

PROSPECTIVE JUROR [NO. 8]: I didn't understand the question. Sorry.

[PROSECUTOR]: If—the phrase presumed innocent gets thrown around a lot, but we hear people say, oh, yes, I know it, I understand it, but then when you ask them about the evidence they will expect that the defendant actually proves . . . that versus the State having the burden of proving guilt.

PROSPECTIVE JUROR [NO. 8]: Okay.

[PROSECUTOR]: So based on everything you've read, and you indicate that you have formed an opinion, is that stuff that you can put aside, or will you go in with a presumption that he is guilty until evidence that proves him innocent?

PROSPECTIVE JUROR [NO. 8]: I could put that aside.

[PROSECUTOR]: If I asked your verdict right now, would it be not guilty?

PROSPECTIVE JUROR [NO. 8]: Yes.

[PROSECUTOR]: Okay.

. . . .

[DEFENSE COUNSEL]: Now, this question is not intended to offend anyone in the room, but I'm concerned that you may be giving answers that you think to the question that people want to hear, so do you have an opinion as to guilt or innocence?

PROSPECTIVE JUROR [NO. 8]: No.

[DEFENSE COUNSEL]: Okay. For sure?

PROSPECTIVE JUROR [NO. 8]: For sure.

[DEFENSE COUNSEL]: All right. Thank you.

Based on Juror No. 8's initial remarks and the publicity of the case, Mauck's attorney moved to strike Juror No. 8 for cause. The court denied Mauck's motion stating, "[S]he's articulate. She's bright. She's educated. I think she's capable of setting aside what she saw on Facebook and reach a verdict only on the evidence."

Mauck exercised his six peremptory strikes but did not strike Juror No. 8. Mauck did not request an additional peremptory strike. Juror No. 8 served as a juror for the trial.

At trial, it was shown J.R. ran a small baking business from her home using Facebook and email to connect with potential clients and collect and fulfill orders. J.R. received a particularly large rush order for some cookies from "Emily Barens." Due to the rush nature of the order, J.R. needed payment in advance, so "Emily" agreed to bring cash over to J.R.'s house on the evening of August 14, 2019.

Around 8:30 p.m., J.R. answered the door at her home. Instead of "Emily," the person at the door was a large, bald man who claimed to be Emily Barens's husband. The man, who later identified himself as Mauck, asked if J.R. could provide a receipt for the order, so they stepped inside her apartment's kitchen. Mauck then asked if he could pay with a credit card instead of cash, which caused J.R. to go further into her apartment to retrieve her cell phone. Mauck followed her into her dining room. While in the dining room, J.R. attempted to charge Mauck's credit card, which was twice declined. J.R. told Mauck there was a problem with his credit card. As the evening progressed Mauck's demeanor changed. J.R. soon found herself lying face down on her living room floor with something hard pressed against her head and Mauck's hand over her mouth. Mauck told J.R. he had a gun and threatened to shoot her if she screamed.

Mauck zip-tied J.R.'s hands behind her back, and then carried her to the couch in the living room. After asking if anyone would be coming over to her apartment, Mauck shoved paper towels into J.R.'s mouth to keep her from screaming. He ordered J.R. to walk to her bedroom, where he told her lie face-

down on her stomach. He removed her clothes, lay down next to her on the bed, and began masturbating. After a few minutes, Mauck got up off the bed, took his clothes off, and forcefully inserted his penis into J.R.'s vagina. After ejaculating on J.R.'s stomach, Mauck ordered her to take a shower. J.R. showered while Mauck watched. She got dressed and Mauck asked J.R. if she would drive him to an ATM to get some cash. She drove Mauck to a drive-thru ATM and withdrew $40.00 to give to Mauck. Mauck continued to hold the gun while J.R. drove, and he told her that if she listened and didn't run or fight him, she wouldn't get hurt. The ATM trip was captured on a surveillance video, which law enforcement later obtained. Mauck ordered J.R. to drop him off a few blocks away.

After Mauck left her car, J.R. went to a friend's house where she reported what had just happened. Seeing the emotional state J.R. was in, observing the injuries on J.R.'s hands, and hearing J.R. had just been sexually assaulted, the friend called the police. An officer arrived at the friend's house and both the friend and the officer agreed J.R. should go to the hospital for a sexual-assault examination. The examination included swabs taken from J.R.'s vagina, anus, and abdomen.

The investigation led to Mauck. A search warrant was conducted at his residence on August 15. Officers located zip-ties consistent with those found at J.R.'s residence, as well as a handgun consistent with the gun described by J.R. Mauck was taken into custody and interviewed. He admitted having been at J.R.'s apartment and some consensual kissing and touching. He denied any sexual contact or intercourse.

The sexual assault samples taken from J.R.'s lower abdomen screened positive for spermatozoa consistent with Mauck's DNA. Screening of J.R.'s vaginal swab indicated the presence of seminal fluid consistent with Mauck's sample.

Mauck called his estranged wife to testify. She stated she was friends with J.R.'s mother. She also testified she had introduced Mauck to J.R. in the past when she and Mauck had been at J.R.'s place of work.

Mauck testified he knew J.R. through his wife and he was uncomfortable with J.R.'s behavior toward him. He stated he went to J.R.'s that evening to help her with a problem she was having with her ex-fiancé and custody of her children. Mauck essentially testified J.R. attempted to seduce him, but he did not have sex with her. He also stated J.R. offered to give him a loan and a ride home. He denied carrying a gun that evening.[1]

The jury found Mauck guilty as charged. A sentencing hearing was scheduled.

After the verdict and before sentencing, Mauck filed a motion asserting newly-discovered evidence warranted a new trial. At a hearing on the motion, Clifton Luckett, a jail inmate at the same time as Mauck, testified he knew J.R., they encountered one another at a gas station after the trial, and J.R. told him she made up her allegations as revenge because Mauck would not leave his wife. Luckett claimed to have recorded the conversation on his smart watch but could not produce the watch or the recording.

---

[1] Mauck testified he found the handgun (seized by police during the search) in a bag on the curb outside an acquaintance's apartment. He described it as "a broken BB gun" and explained the bag in which he found it also contained empty CO2 cartridges.

J.R. testified and denied knowing or speaking to Luckett.

The court observed:

> [T]he factors the court should look at in evaluating [whether newly-discovered evidence merits a new trial] are found from *State v. Jefferson*, 545 N.W.2d 248, a 1996 case here in Iowa. And in order to prevail on a motion for new trial based on newly-discovered evidence, a defendant must show that the evidence, number one, was discovered after the verdict; number two, could not have been discovered earlier in the exercise of due diligence; number three, is material to the issues in the case and not merely accumulative; and four, probably would have changed the result of the trial.

After finding the first two elements satisfied, the court noted:

> [N]umber three, statements about the credibility of the State's complaining witness would be material to the issues in the case and not merely accumulative.
>
> The fourth prong, as [defense counsel] pointed out, is a little more vexing; that is, the newly-discovered evidence probably would have changed the result of the trial.
>
> First of all, in order for newly-discovered evidence to change the outcome of a case, it would have to be credible in some way, believable in some way or be of the type that a jury would typically rely upon to reach their verdict.
>
> Mr. Luckett's statements are nearly incredible. They are not the type that are believable. I can find no basis to think that his story has any legitimate, reasonable truthfulness to it based upon the circumstances in which he presented here on the witness stand.
>
> And I recognize that as a trial court I'm at a special advantage that the appellate court does not have. But Mr. Luckett was—and I want to make this part of the record—difficult to understand, not precise in his statements. He was not forthcoming in what he was saying. And he did not present an appearance that made him look believable or even the manner in which he presented it made it seem that he himself truly believed it, based upon my personal observations of him.
>
> It's also important for me to keep in mind that his version of what [J.R.] reported to him is not consistent with either of the versions that Mr. Mauck has presented, whether it's the one he gave to law enforcement when he was interviewed or the version he gave to the jury when he testified. It doesn't match up with what he reports the situation was either, which makes it less credible as well and also less likely to change the outcome of the case because it would not support the defendant's version of what is to have occurred.
>
> . . . .

But this complaining witness has been consistent in all those versions that have been talked about during the trial and in her various comments in the court file as well. And that makes it even less believable that at the Circle K sometime between Thanksgiving and Christmas she would have suddenly come up with this different version of what happened than what she's told the court on numerous occasions; what she's put on social media on dozens of occasions; and put out on traditional mainstream media on more than one occasion.

And as a result, it is my conclusion that the reported newly-discovered evidence would not probably have changed the result of the case and the motion for new trial on that ground is also denied.

Mauck now appeals the court's denial of his motion to strike for cause and the denial of his motion for new trial. Both claims are reviewed for an abuse of discretion. *See State v. Jonas*, 904 N.W.2d 566, 570 (Iowa 2017) (challenge to potential jurors); *State v. Uranga*, 950 N.W.2d 239, 243 (Iowa 2020) (newly-discovered evidence).

Even if we presume the district court abused its discretion in not striking Juror No. 8 for cause, Mauck did not use a peremptory challenge to strike the juror No. 8 or seek an additional peremptory challenge to strike Juror No. 8. *See Jonas*, 904 N.W.2d at 583 ("Specifically, in order to show prejudice when the district court improperly refuses to disqualify a potential juror under Iowa Rule of Criminal Procedure 2.18(5)(k) and thereby causes a defendant to expend a peremptory challenge under rule 2.18(9), the defendant must specifically ask the court for an additional strike of a particular juror after his peremptory challenges have been exhausted."). Consequently, we will not presume prejudice, and Mauck has failed to show actual prejudice. *See id.* at 583–84.

We turn to Mauck's motion for new trial. The district court properly stated the appropriate factors.[2] The district court found Luckett not believable and noted his testimony was not even consistent with Mauck's. The court's reasoning was neither unreasonable nor untenable. *See Uranga*, 950 N.W.2d at 243 ("An abuse of discretion occurs when the trial court exercises its discretion 'on grounds or for reasons clearly untenable or to an extent clearly unreasonable.'" (citations omitted)). The trial judge's "familiarity with the trial record and firsthand knowledge of the new witness['s] credibility entitle [her] ruling to considerable deference on review." *See State v. Weaver*, 554 N.W.2d 240, 245 (Iowa 1996), *overruled on other grounds by State v. Hallum*, 585 N.W.2d 249, 254 (Iowa 1998). We discern no abuse of the court's broad discretion in its conclusion Luckett's testimony probably would not have changed the result of the trial. We therefore affirm.

**AFFIRMED.**

---

[2] "A motion for new trial on the basis of newly discovered evidence should be granted only where the evidence '(1) was discovered *after* the verdict, (2) could not have been discovered earlier in the exercise of due diligence, (3) is material to the issues in the case and not merely cumulative, and (4) probably would have changed the result of the trial.'" *Uranga*, 950 N.W.2d at 243 (citations omitted).